# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAY STONE, FREDERICK K. WHITE, FRANK L. COCONATE, DENISE DENISON, BILL "DOC" WALLS, and HOWARD RAY, <br><br> Plaintiffs, <br><br> v. <br><br> BOARD OF ELECTIONS COMMISSIONERS FOR THE CITY OF CHICAGO, et al., <br><br> Defendants. | Case No. 10-cv-7727 <br><br> Judge Robert M. Dow, Jr. |

## MEMORANDUM OPINION AND ORDER

On December 6, 2010, Plaintiffs Jay Stone, Frederick K. White, Frank L. Coconate, Denise Denison, Bill "Doc" White, and Howard Ray ("Plaintiffs") filed this action challenging the constitutionality of an Illinois statute, 65 ILCS 20/21-28(b), which requires Plaintiffs and other individuals seeking to be placed on the municipal ballot for mayor, city clerk, or city treasurer to obtain 12,500 signatures from legal voters of the City of Chicago. Plaintiffs seek to enjoin Defendant Board of Elections Commissions for the City of Chicago ("Board") from barring certain Plaintiffs who were unable to meet this statutory requirement from the February 22, 2011 ballot. Plaintiffs originally brought five counts, but voluntarily dismissed counts II (Abridgement Equal Protection Clause—14th Amendment Claim) and V (Abridgement of First Amendment) of their first amended complaint. Plaintiffs also have dismissed the individual Defendants, all of whom are Commissioners of the Board. Remaining in Plaintiffs' second amended complaint [32] are three counts – Count I (Abridgement of First Amendment—42 U.S.C. 1983), Count II (Abridgement 14th Amendment, Deprivation of Liberty, Freedoms of Speech and Association), and Count III (Abridgement of Right to Petition the Government)

1

against Defendant Board. Defendant contends that Plaintiffs' suit lacks merit because the signature requirement does not impermissibly burden ballot access and is based on the State's compelling interest in running a fair, orderly, and effective election, which is advanced by requiring candidates to demonstrate a significant modicum of support.

Currently before the Court is Plaintiff's request for injunctive relief [4] and supporting materials. After taking the parties' briefs on an expedited schedule, on January 4, 2011, the Court heard oral argument on Plaintiffs' request for injunctive relief by virtue of a declaratory ruling that the 12,500 signature ballot access requirement is unconstitutional. For the reasons set forth below, Plaintiffs' request for injunctive relief [4] is denied.[1]

**I.     Background**

Plaintiffs Jay Stone, Frederick K. White, Bill "Doc" Walls, and Howard Ray submitted nominating petitions seeking to be placed on the ballot as candidates for mayor of the City of Chicago in the upcoming municipal election on February 22, 2011. Plaintiff Frank L. Coconate submitted a nominating petition seeking to qualify as a candidate for city clerk. Walls met the statutory requirement of 12,500 presumptively valid signatures and he will be a candidate listed on the February 2011 mayoral ballot. The other Plaintiffs did not meet the requirement and thus the Board has determined that they will not be on the ballot: Stone filed 250 signatures; White filed approximately 10,200 signatures; Ray filed 2,625 signatures; and Coconate filed 61 signatures. Plaintiffs Denise Denson and Walls assert that not having the other Plaintiffs' names on the February ballot will abridge their First Amendment rights.

The 12,500 signature statutory requirement is found in 65 ILCS 20/21-28(b), which became effective August 22, 2005. The statute—"Nomination by petition"—provides in

---

[1] Since the January 4 oral argument, both Defendant and Plaintiffs have filed motions to supplement the record [28, 31]. Consistent with the Court's minute order of January 5 [29], both motions [28, 31] are granted.

2

relevant part as follows: "(b) All nominations for mayor, city clerk, and city treasurer in the city shall be by petition. Each petition for nomination of a candidate must be signed by at least 12,500 legal voters of the city." 65 ILCS 20/21-28(b). Prior to the enactment of this 12,500 signature provision, state law required 25,000 signatures or a number not less than five percent of the number of voters who voted in the last election for City office, whichever was less.[2] As further explained below, the prior signature requirement of 25,000—double the current requirement—repeatedly has been upheld by the United States Supreme Court and the Seventh Circuit.

## II. Analysis

Plaintiffs' "prayer for injunctive relief & declaratory ruling" does not acknowledge the law that governs the relief they are seeking—a preliminary injunction.[3] Like all forms of injunctive relief, a preliminary injunction is "an extraordinary remedy that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original); see also *Goodman v. Ill. Dep't of Financial & Professional Reg.*, 430 F.3d 432, 437 (7th Cir. 2005) (same). A party seeking a preliminary injunction must demonstrate as a threshold matter that (1) its case has some

---

[2] One state representative explained the legislature's approach when discussing the statute in question:

> [W]hat we will have is signature requirements of a good deal less than one-half of one percent for someone running for Mayor of the City of Chicago or other city offices * * * * The earlier requirement to run for Mayor of the City of Chicago, 25 thousand signatures, was almost a full percent of the populous and we thought that was too high. We thought that created a situation which many people who might legitimately stand for that office would not be able to meet the signature requirement. And we think 12,500 gives people a much better opportunity to stand for one of those municipal offices in Chicago.

94th Ill. Gen. Assembly, House Proceedings, May 28, 2005, at 11-12 (Statements of Representative Currie).

[3] In addition to injunctive relief, plaintiffs also request that the Court make a declaratory finding that the 12,500 signature requirement is unconstitutional.

3

likelihood of succeeding on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if preliminary relief is denied. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If the moving party meets its initial burden, then the court must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied. *Storck USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). The court also considers the public interest served by granting or denying the relief, including the effects of the relief on non-parties. *Id.*

### A. Likelihood of Success on the Merits

A party seeking a preliminary injunction must demonstrate "that it has a 'better than negligible' chance of success on the merits of at least one of its claims." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A.*, 549 F.3d 1079, 1096 (7th Cir. 2008). This is an "admittedly low requirement." *Id.* However, if a plaintiff fails to demonstrate any likelihood of success on the merits, the motion for preliminary injunction must be denied. See, *e.g., Cox v. City of Chicago,* 868 F.2d 217, 223 (7th Cir. 1989). As described below, Supreme Court and Seventh Circuit precedent makes clear that on these facts and with this signature provision, Plaintiffs have no likelihood of success on the merits of their claims absent a change in the controlling law by either of the aforementioned courts.

#### *1. Framework*

Without question, "[t]he First Amendment protects the right of citizens to associate and form political parties for the advancement of common political goals and ideals." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997). "On the other hand, it is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots

4

to reduce election- and campaign-related disorder." *Id.* at 358. As the Supreme Court has explained, "As a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). The right to vote and the right of citizens to associate for political purposes are among the more fundamental constitutionally protected rights, but those rights are not absolute. *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986).

Reasonable restrictions may be imposed on candidates because states have an interest in requiring a demonstration of qualification in order for the elections to be run fairly and effectively. *Id.* This is not only a state's interest; it is a duty to ensure an orderly electoral process. *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 774 (7th Cir. 1997). States have a strong interest in preventing voter confusion by limiting ballot access to candidates who can demonstrate a measurable quantum of support or a level of political viability. *Lee v. Keith*, 463 F.3d 763, 769 (7th Cir. 2006). The "preliminary demonstration of a 'significant modicum of support' furthers the state's legitimate interest of 'avoiding confusion, deception, and even frustration of the democratic process at the general election.'" *Rednour*, 108 F.3d at 774 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)). The Supreme Court in *Munro* held that a state is not required to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of such reasonable restrictions on ballot access. *Munro*, 479 U.S. at 194-95. "To demand otherwise would require a state's political system to sustain some damage before it could correct the problem, deprive state legislatures of the ability to show foresight in avoiding potential deficiencies, and inevitably lead to endless litigation regarding the sufficient amount of voter

confusion and ballot overcrowding needed to warrant ballot access restrictions." *Rednour*, 108 F.3d at 774 (citing *Munro*, 479 U.S. at 195-96).

Applying the balancing test articulated in *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983), a court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789). A regulation that severely burdens First Amendment rights must be justified by a compelling interest and must be narrowly tailored to serve that interest. *Anderson*, 460 U.S. at 789. On the other hand, a state law that imposes only "reasonable, nondiscriminatory restrictions" upon the protected rights passes constitutional muster if it serves important state regulatory interests. *Burdick*, 504 U.S. at 434.

*2. State's interest in regulating the number of candidates on ballot*

Although Plaintiffs contend that they can "only guess" as to the state's interest in setting a signature requirement for municipal candidates, the Supreme Court repeatedly has recognized that states have a legitimate interest in regulating the number of candidates appearing on the ballot as a means "to forestall frivolous candidacies and concomitant 'laundry list' ballots that merely serve to confuse the voter[.]" *Lubin v. Panish*, 415 U.S. 709, 718 (1974). Long lists of potentially frivolous candidates discourage voter participation and confuse and frustrate those who wish to seriously participate in the electoral process. *Id.*; see also *Storer v. Brown*, 415 U.S. at 732-33 ("the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the

6

winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections"). As the Seventh Circuit noted in *Protect Marriage Illinois v. Orr*, 463 F.3d 604, 607 (7th Cir. 2006), if a state was required to list everyone who wanted to stand for office, "ballots would be the size of telephone books." In addition to limiting the number of candidates so that states and other governmental bodies can run fair, effective, and organized elections, states have a legitimate interest in "avoiding confusion, deception, and even frustration of the democratic process at the general election." *Rednour*, 108 F.3d at 774 (quoting *Jenness*, 403 U.S. at 442); see also *Lee v. Keith*, 463 F.3d at 769. As the Supreme Court held in *Lubin v. Panish*, "[t]he means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not." 415 U.S. at 715.

In seeking (among other things) to require the Board to place on the ballot a candidate with only 61 signatures, Plaintiffs appear to be seeking a ballot without restriction. As the Seventh Circuit has held, a state can "impose reasonable restrictions on access, as by requiring * * * that the would-be candidate demonstrate significant support for his candidacy by submitting thousands (or, depending on the size of the electorate, tens or even hundreds of thousands) of petitions in order to prevent the voter confusions that would be engendered by too long a ballot." *Protect Marriage Illinois*, 463 F.3d at 607-08. To reach the requisite 12,500 signatures, a potential candidate need obtain signatures from fewer than 1% of the registered voters in Chicago. Plaintiffs nevertheless contend that the 12,500 signature requirement "is best described as a ballot access barrier that is so high that only a few can make it to the ballot." Pl. Brief at 7.

Both history and the facts arising out of this election tell a different story. In the 2007 Municipal General Election, in which the 12,500 signature requirement first applied, seven candidates appeared on the municipal ballot: three for mayor; three for city clerk; one for treasurer. According to Plaintiffs' own Exhibit 4, there are 15 individuals who obtained at least 12,500 signatures for the 2011 election for the position of mayor alone.[4] The number of candidates meeting the signature requirement "illustrates that the requirements do not pose an insurmountable obstacle" to the municipal ballot. *Rednour*, 108 F.3d at 775. And while acquiring the requisite signatures undoubtedly requires effort and some resources, not every candidate expressing a desire to become a candidate for these offices is entitled as a matter of right to a place on the ballot. As the Supreme Court said in *Lubin*, "[a] procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process." 415 U.S. at 715. The 12,500 signature requirement is not an unreasonable means of measuring the seriousness of the candidate's desire and motivation to gain ballot access in a city containing more than 1.3 million registered voters.

   2.   *Burden imposed by requirement*

Supreme Court case law demonstrates that more restrictive signature requirements than the one at issue here are constitutionally sound. In the first case to come before the United States Supreme Court on the issue of whether a 5% petition signature was permissible, the Court held, "we cannot say that Georgia's 5% petition requirement [requiring that petition

---

[4] Although counsel for Plaintiffs suggested at oral argument that some of the 15 candidates may not ultimately be listed on the ballot as a result of challenges to their petitions, the parties appear to be in agreement that the mayoral ballot will include at least 9 names. See Pl. Supp. [31-1], at 1 (contending that "only 9 of the 20 who filed for mayor satisfied the 12,500 signature requirement" on the basis of various challenges to the petitions of certain candidates).

must be signed by a number of electors of not less than 5% of the total number of electors eligible to vote in the last election for the filling of the office the candidate is seeking] violates the Constitution." *Jenness v. Fortson*, 403 U.S. at 438. The Seventh Circuit, relying on the Supreme Court in *Jenness*, specifically found both the previous requirement of 25,000 signatures for a mayoral petition and a 5% requirement to be constitutionally permissible. In *Rednour*, 108 F.3d 768, the Seventh Circuit upheld Illinois' 5% petitioning requirement. Citing *Jenness*, the Seventh Circuit concluded that such a petitioning requirement "neither freezes the status quo of American political life, nor in any way abridges the rights of free speech and association secured by the First and Fourteenth Amendments." *Id*. at 774. As the Seventh Circuit explained, "[b]ecause the Illinois ballot access requirements are nearly identical to those in *Jenness* and *Norman*, and because they similarly further the State's important interests in a rational manner, we find that they do not unconstitutionally burden the [plaintiff's] First and Fourteenth Amendment rights." 108 F.3d at 776. As discussed in *Rednour*, the Supreme Court in *Norman* upheld an Illinois election provision which required a candidate to obtain 5% of the vote or 25,000 petition signatures before the candidate could be placed on a ballot in a particular district. *Id.* (citing *Norman v. Reed*, 502 U.S. at 295). The *Rednour* court further held that Illinois' 5% signature petition requirement as applied to each district advanced the State's separate and additional interest of ensuring a modicum of support for the candidate in the electoral subdivision for which the candidate is nominated. 108 F.3d at 775.

A number of the cases in which federal courts have expressly held or commented that a 5% signature requirement is constitutionally permissible involved Illinois statutes. See, *e.g.*, *Jackson v. Ogilvie*, 325 F. Supp. 864, 868 (N.D. Ill. 1971), *aff'd*, 403 U.S. 925 (1971); *Illinois*

9

*State Board of Elections v. Socialist Workers Party*, 440 U.S. 173 (1979); *Black v. Cook County Officers Electoral Board*, 750 F. Supp. 901, 908 (N.D. Ill. 1990); *Norman v. Reed*, 502 U.S. 279; and *Rednour*, 108 F.3d 768, 775-76. Two of these cases—*Jackson* and *Socialist Workers Party*—specifically addressed the 5% signature requirement that previously governed City of Chicago elections. Soon after *Jenness*, the Supreme Court summarily affirmed a decision of a three-judge panel of the United States District Court for the Northern District of Illinois in *Jackson v. Ogilvie*, 325 F. Supp. 864 (N.D. Ill. 1971), *aff'd*, 403 U.S. 925, 91 S.Ct. 2247 (1971). The three-judge panel held: "The question more pointedly is, can the state limit the availability of the ballot to only those candidates who evidence the support of 5% of the electorate? We think it can * * * * While the 5% requirement is higher than the percentage required in a majority of other states [citing *Williams v. Rhodes*] nonetheless we feel it is a reasonable limitation that serves a compelling state interest." 325 F. Supp. at 868.[5]

In 1990, the court in *Black v. Cook County Officers Electoral Board*, considered Illinois' previous 5% or 25,000 signature requirement as applied to candidates in Cook County. The court rejected claims that the 5%/25,000 signature requirement imposed for a city and suburban component was irrational and unreasonable. The court stated: "Nothing in either *Moore* [*v. Ogilvie*] or *Socialist Workers'* counsels this court to find a signature requirement of the lesser of 25,000 or 5% unconstitutional." 750 F. Supp. at 907 (citing *Jenness v. Fortson* and *American Party of Texas v. White*, 415 U.S. 767 (1974)). Then, in a related case, *Norman v. Reed*, the United State Supreme Court held that the same provisions attacked in *Black* could not be used to effectively require a new party to collect a total of 50,000, comprised of 25,000

---

[5] In view of *Jackson* and the other cases upholding a 5% signature requirement, the fact that it may be more difficult to qualify for a spot on the mayoral ballot in Chicago than in many other large cities raises an issue of public policy for the General Assembly, not a matter for redress under the Constitution.

signatures from each of the city and suburban components of Cook County. In *Norman*, the Court noted that "[T]his is not our first time to consider the constitutionality of an Illinois law governing the number of nominating signatures the organizers of a new party must gather to field candidates in local elections." 502 U.S. at 292. Recalling its earlier decision in the *Socialist Workers' Party* case, the Court observed that subsequent to the decision in that case, the Illinois legislature had acted to cap the 5% signature requirement for "any district or political subdivision" at 25,000, as it already had done for State offices. The Court in *Norman* embraced the reasoning of its decision in *Jenness* and left intact the 25,000 signature requirement for district and political subdivision candidates.[6]

---

[6] Federal courts have upheld similar provisions in other states' laws as constitutional. In *Storer v. Brown*, the Supreme Court held that a California requirement that independent candidates file nomination papers signed by voters not less in number than 5% nor more than 6% of the entire vote cast in the preceding general election in the area for which the candidate seeks to run did not appear to be excessive. In *American Party of Texas*, 415 U.S. at 789, the Court held that a Texas law requiring signatures that equal 3% or 5% of the vote was not facially invalid. See also *Arutunoff v. Oklahoma State Election Board*, 687 F.2d 1375, 1379 (10th Cir. 1982) (upholding Oklahoma's 5% signature requirement, saying that "to require a new political party to demonstrate that it has some degree of political support by obtaining the signatures of registered voters equal to five percent of the total votes cast in the preceding general election for either President or Governor is not unreasonable."); *Populist Party v. Herschler*, 746 F.2d 656, 660 (10th Cir. 1984) (upholding Wyoming's 5% signature requirement and acknowledging that "[b]oth the Supreme Court and this court have upheld election laws restricting ballot access to independent candidates who file petitions with signatures representing 5% of the voters."); *Rainbow Coalition of Oklahoma v. Oklahoma State Election Board*, 844 F.2d 740, 745 (10th Cir. 1988) (finding that Oklahoma's 5% requirement is "undeniably constitutional" and "we do not believe the [Supreme] Court would attach constitutional significance to the fact that the number of signatures representing five percent fluctuates on the basis of voter interest, as represented by voter turnout."); *Prestia v. O'Connor*, 178 F.3d 86, 89 (2d Cir. 1999) ("[W]e apply the general rule that a ballot access requirement of signatures from five percent of the relevant voter group ordinarily does not violate constitutional rights"); *Hewes v. Abrams*, 718 F. Supp. 163, 167 (S.D. N.Y. 1989), *aff'd*, 884 F.2d 74 (2d Cir. 1989) (New York's requirement that to qualify for mayoral primary a candidate must present a petition signed by either 5% of the persons registered in his party, or by 10,000 persons, whichever is fewer, was sustained, observing that "under *Jenness* a standardized 5% signature requirement would not be unconstitutional"); *Libertarian Party of Kentucky v. Ehrler*, 776 F. Supp. 1200, 1208 (E.D. Ky. 1991) ("The generalization to be distilled from the foregoing cases is that a state can require nominating petitions of independent candidates and minority party candidates to contain signatures equal to five percent (5%) of the total votes cast in the most recent election"); *Marchant v. Umane*, 1997 WL 704923 (E.D.N.Y. 1997) (5% signature requirement does not present a colorable constitutional claim); *Rodriguez v. Pataki*, 2002 WL 1733676 (S.D.N.Y. 2002) ("[I]t is plain that the 5%/1,250 signature requirement remains a generally valid regulation that furthers the important state

11

Plaintiffs' complaint and briefs closely track *Lee v. Keith*, 463 F.3d 763 (7th Cir. 2006), a case in which the court considered whether a signature requirement for independent candidates of 10% of the voters in the preceding general election was an impermissible burden on those candidates. *Id.* As must be obvious to all parties, the percentage required for ballot access in *Lee* is substantially higher than the percentage resulting from the 12,500 requirement (which is equal to 2.7% of voters in the last election). Moreover, the ballot access restrictions in *Lee* went well beyond a lofty percentage requirement. *Lee* also involved other restrictions, including: a provision that signing an independent candidate's petition disqualified that individual from voting in the primary; a requirement that independents, despite having a higher signature burden, submit their petition at the same time as party candidates (92 days before the primary, and 323 days before the general election); and a requirement that all signatures had to be obtained within the 90 days immediately preceding the filing deadline. As a measure of the severe burden imposed by the combined ballot access restrictions, the *Lee* court found significant that since the provisions had been enacted, competition from independent candidates had been "completely eliminated," whereas before they were able to compete with some regularity. *Id.* at 768-69 ("Not only are unaffiliated legislative candidacies rare in Illinois, in the last 25 years they have been non-existent"). Unlike *Lee*, the only challenge here is to the 12,500 signature requirement (2.7%), which on its face is not severe and which produces a percentage that falls well below higher percentages supported by substantial case law.[7]

---

interest of requiring some preliminary showing of a significant modicum of support before a candidate's name will be placed on the ballot.").

[7] In their efforts to mirror *Lee*, Plaintiffs rely on the signature requirements of other jurisdictions. However, Plaintiffs have no case law and no historical record to demonstrate that the 12,500 signature

It is abundantly clear from the long line of cases cited by the Board that Illinois' requirement that candidates for the offices of mayor, clerk and treasurer in the City of Chicago submit petitions containing signatures of 12,500 voters, which is less than 3% of the voters who voted in the last city election and less than 1% of the number of registered voters in Chicago, passes constitutional muster under existing, controlling precedent. In light of the overwhelming case law discussed above, Plaintiffs cannot argue the 12,500 signature requirement is severe on its face. Further, the number of individuals gaining access to the ballot for the February 2011 election demonstrates that the statutory requirement does not pose an insurmountable hurdle to a candidate's access. Because the ballot restriction is not severe, this Court need not determine whether it is narrowly tailored to satisfy the State's compelling interests. *Rednour*, 108 F.3d at 775. The signature requirement here imposes a "reasonable, nondiscriminatory restriction," so it need be supported only by a legitimate state interest. *Burdick*, 504 U.S. at 434. Furthermore, as the Supreme Court held in *Munro*, "there is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing a name of a [candidate] on the ballot—the interest, if no other, in avoiding confusion, deception and even frustration of the democratic process at the general election." *Munro*, 479 U.S. at 193-94 (addressing and following the Supreme Court's prior holding in *Jenness*, which found that a state has a *compelling* state interest in requiring a preliminary showing of significant support before placing a candidate on the general election ballot).[8]

---

requirement is an unconstitutional and impermissible burden. There is ample legal precedent establishing the constitutionality of signature requirements stricter than 65 ILCS 20/21-28(b).

[8] Although the parties appeared to agree at oral argument that there is no provision of the Election Code that permits voters to sign only one mayoral petition, Plaintiffs have submitted an "Index of Electoral Board Decisions" [see 31-1, at 54] that they contend "goes to the reasonable belief and conclusion of

Because the more restrictive provisions of 25,000 signatures for a mayoral candidate in the City of Chicago and/or the 5% rule imposed in a number of jurisdictions across the country are constitutionally sound under Supreme Court and Seventh Circuit precedent, Plaintiffs have no likelihood of success in proving the unconstitutionality of the current 12,500 signature requirement (which is equal to 2.7% of the voters who voted in the last election, or less than 1% of registered voters in Chicago) absent a change in controlling law. And given that Plaintiffs have failed to make a sufficient showing as to the first three requirements for the issuance of an injunction, the Court need not balance the harm that Defendant will suffer against the harm that Plaintiffs would suffer if relief is denied or consider the effect of an injunction on the public interest. See, *e.g.*, *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 830 (7th Cir. 2002) ("That DaimlerChrysler has shown no likelihood of success on the merits is reason enough to deny the motion for preliminary injunction without further discussion"); *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 730 (7th Cir. 1998) ("a district court may decline to address the remaining elements of a preliminary injunction if a plaintiff fails to demonstrate a reasonable likelihood of prevailing on the merits of the underlying claim") (citing *Ping v. Nat'l Educ. Assoc.*, 870 F.2d 1369, 1371 (7th Cir. 1989)).[9]

---

the plaintiffs" that voters are limited to signing only one petition [see *id.* at 1]. However, the authority cited in the Board decisions referenced in Plaintiffs' exhibit is Section 10-3 of the Election Code (10 ILCS 5/10-3), which pertains to the nomination of *independent* candidates. The next section of the Code, 10 ILCS 5/10-3.1, appears to apply to petitions for nominations of *nonpartisan* candidates, which the Court understands is the proper classification for candidates for the office of Mayor of Chicago. There is no indication in the exhibit of Board decisions that shows one way or the other how (or even whether) the Board has opined on the matter of how many petitions a voter may sign in a *nonpartisan* election.

[9] Even if Plaintiffs had met their burden of showing the absence of an adequate remedy at law and irreparable harm in the absence of injunctive relief, that factor does not weigh as heavily here as it does in many other cases because of the controlling precedent on the likelihood of success on the merits prong. Furthermore, as the cases explicitly demonstrate, these elections cases inherently balance the

**III.	Conclusion**

For these reasons, Plaintiffs' request for injunctive relief [4] is denied.

Dated:  January 10, 2011	_____
	Robert M. Dow, Jr.
	United States District Judge

---

harms that plaintiffs, defendants, and the public would suffer in the event relief is denied.  Thus, those concerns are by necessity encompassed in any discussion of the merits of Plaintiffs' claims.