**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAY STONE, FREDERICK K. WHITE, | ) | |
| FRANK L. COCONATE, DENISE DENISON, | ) | |
| BILL "DOC" WALLS, and HOWARD RAY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 10-cv-7727 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| BOARD OF ELECTIONS COMMISSIONERS | ) | |
| FOR THE CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Jay Stone, Frederick K. White, Frank L. Coconate, Denise Denison, Bill "Doc" White, and Howard Ray filed this action challenging the constitutionality of an Illinois statute, 65 ILCS 20/21-28(b), which requires Plaintiffs and other individuals seeking to be placed on the municipal ballot for mayor, city clerk, or city treasurer to obtain 12,500 signatures from legal voters of the City of Chicago.  In December 2010, Plaintiffs moved for a preliminary injunction prohibiting the Board from enforcing the requirement in the municipal election on February 22, 2011.  In ruling on Plaintiffs' motion for a preliminary injunction, the Court concluded that the 12,500 signature requirement of 65 ILCS 20/21-28(b) passes constitutional muster.  Plaintiffs appealed, and the Seventh Circuit dismissed Plaintiffs' appeal as moot.  Plaintiffs then returned to district court to begin anew.

Plaintiffs' third amended complaint for declaratory, equitable, and monetary relief suggests that two additional statutes, alone or in combination with the minimum signature requirement, create an impermissible burden on ballot access.[1]  Currently before the Court is

---

[1]  Plaintiffs' third amended complaint drops Frank Coconate as a plaintiff.

Defendant's motion to dismiss Plaintiff's third amended complaint [102]. For the reasons set forth below, the Court grants Defendant's motion [102].

## I.     Background

Plaintiffs' first three complaints challenged a statutory requirement that petitions filed by candidates seeking to get on the ballot for election to the office of mayor, clerk or treasurer of the City of Chicago be signed by at least 12,500 registered voters of the City (65 ILCS 20/21-28(b)). Ruling on a preliminary injunction based on the second amended complaint, the Court concluded that "it is abundantly clear from the long line of cases cited by the Board that Illinois' requirement that candidates for the offices of mayor, clerk and treasurer in the City of Chicago submit petitions containing signatures of 12,500 voters * * * passes constitutional muster under existing controlling precedent." See Memorandum Opinion and Order ("Mem. Op.") at 13.[2] Accordingly, the Court held that "Plaintiffs have no likelihood of success in proving the unconstitutionality of the current 12,500 signature requirement (which is equal to 2.7% of the voters who voted in the last election, or less than 1% of the registered voters in Chicago) absent a change in controlling law." *Id.* at 14.

Plaintiffs' third amended complaint continues to challenge the constitutionality of the 12,500 signature requirement "for reasons which include that it acts in concert with two other significant ballot restrictions (a one signature requirement and a 90-day collection period), and that such additional restrictions amplify the burden of the signature requirement." Third Amended Complaint ("TAC") at 1-2. Notwithstanding the Court's prior ruling that the statute passes constitutional muster under controlling precedent, Plaintiffs also maintain the 12,500

---

[2]  The Court incorporates by references the legal authorities and analysis set forth in the Court's memorandum opinion and order denying Plaintiffs' motion for preliminary injunction.

signature requirement in and of itself is "onerous, restrictive and unconstitutional." TAC, ¶¶ 13-14, 23-29.

Plaintiffs also contend, as they did in their first and second amended complaints, that the "Election Code does not bar Chicago voters from signing more than one petition as in signing for more than one candidate," but the Board nevertheless imposes such a "notion" or "policy," which adversely affected them. TAC, ¶30. Contradicting that assertion, Plaintiffs also claim that the Board enforces 10 ILCS 5/10-3, a statute that limits voters to signing one petition. TAC, ¶ 34. Plaintiffs assert that the "one signature" rule, independent of the signature requirement (or the 90-day collection rule), is a "significant" ballot restriction and "amplified the restrictive and onerous" signature requirement, thereby abridging their First Amendment rights. TAC, Count I, ¶¶ 34-35.

Plaintiffs' third claim, asserted for the first time, is that the prohibition against obtaining signatures more than 90 days before the last day for filing petitions (10 ILCS 5/10-4), independent of the signature requirement or the one-signature rule, is "a significant ballot restriction." TAC, Count I, ¶ 36. They contend that the 90-day collection rule "amplified the restrictive and onerous" signature requirement and abridges Plaintiffs' First Amendment rights. TAC, Count I, ¶¶ 36-37. Finally, Plaintiffs suggest that the denial of injunctive relief "may not have occurred" but for an alleged "representation" by the Board's counsel that the Board "had not imposed or does not impose a one-signature requirement." TAC, ¶¶ 19-21. Plaintiffs contend that they were harmed by the Board "having mislead [sic] the District Court as to the one-signature requirement," resulting in the abridgement of their rights under the First Amendment. TAC, Count I, ¶ 49.

Count I of the third amended complaint alleges that the 12,500 signature requirement abridges Plaintiffs' rights under the First Amendment; Count II alleges that Plaintiffs were deprived of their substantive due process as to freedom of speech and association, harmed by loss of money, resources and time "attempting to and securing signatures," and deprived of their right to see on the ballot the names of their candidates; and Count III alleges that Plaintiffs were deprived of their right to petition the government. All three counts seek relief in the form of "a declaratory ruling that the 12,500 [signature] requirement is unconstitutional" and judgment against Defendant for costs and attorney's fees.

## II.    Legal Standard for Rule 12(b)(6) Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the suit. See *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990) (citations omitted). To survive a Rule 12(b)(6) motion to dismiss, a complaint must satisfy the requirements of Rule 8. Fed. R. Civ. P. 8. First, the complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic*, 550 U.S. at 555, 569 n.14). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic*, 550 U.S. at 579-80. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not

need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citations, quotation marks, and brackets omitted).

### III. Analysis

Plaintiffs Jay Stone, Frederick K. White, Bill "Doc" Walls, and Howard Ray submitted nominating petitions seeking to be placed on the ballot as candidates for mayor of the City of Chicago in the municipal election on February 22, 2011. Walls met the statutory requirement of 12,500 presumptively valid signatures and was a candidate listed on the February 2011 mayoral ballot. The other Plaintiffs did not meet the requirement and were not on the ballot: Stone filed 250 signatures; White filed approximately 10,200 signatures; and Ray filed 2,625 signatures. Plaintiffs Denise Denson and Bill Walls asserted that not having the other Plaintiffs' names on the February ballot will abridge their First Amendment rights.

The 12,500 signature statutory requirement is found in 65 ILCS 20/21-28(b), which became effective August 22, 2005. The statute—"Nomination by petition"—provides in relevant part as follows: "(b) All nominations for mayor, city clerk, and city treasurer in the city shall be by petition. Each petition for nomination of a candidate must be signed by at least 12,500 legal voters of the city." 65 ILCS 20/21-28(b). Prior to the enactment of this 12,500 signature provision, state law required 25,000 signatures or a number not less than five percent of the number of voters who voted in the last election for City office, whichever was less.[3] As

---

[3] One state representative explained the legislature's approach when discussing the statute in question:

> [W]hat we will have is signature requirements of a good deal less than one-half of one percent for someone running for Mayor of the City of Chicago or other city offices * * * * The earlier requirement to run for Mayor of the City of Chicago, 25 thousand signatures, was almost a full percent of the populous and we thought that was too high.

further explained below, the prior signature requirement of 25,000—double the current requirement—repeatedly has been upheld by the United States Supreme Court and the Seventh Circuit.

Plaintiffs, other than Walls, were unable to meet the lower threshold of support required by the Illinois statute and now ask the Court to hold the State's signature requirement unconstitutional. Plaintiffs also contend that the 12,500 signature requirement for mayor, city clerk, and city treasurer of Chicago, together with a "one signature" rule and a "90 day collection period," are individually and collectively unconstitutional.

A.      Signature Requirement

Without question, "[t]he First Amendment protects the right of citizens to associate and form political parties for the advancement of common political goals and ideals." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997). "On the other hand, it is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder." *Id.* at 358. As the Supreme Court has explained, "As a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Storer v. Brown*, 415 U.S. 724, 730 (1974). The right to vote and the right of citizens to associate for political purposes are among the more fundamental

---

We thought that created a situation which many people who might legitimately stand for that office would not be able to meet the signature requirement. And we think 12,500 gives people a much better opportunity to stand for one of those municipal offices in Chicago.

94th Ill. Gen. Assembly, House Proceedings, May 28, 2005, at 11-12 (Statements of Representative Currie).

constitutionally protected rights, but those rights are not absolute. *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986).

Reasonable restrictions may be imposed on candidates because states have an interest in requiring a demonstration of qualification in order for the elections to be run fairly and effectively. *Id.* This is not only a state's interest; it is a duty to ensure an orderly electoral process. *Libertarian Party of Illinois v. Rednour*, 108 F.3d 768, 774 (7th Cir. 1997). States have a strong interest in preventing voter confusion by limiting ballot access to candidates who can demonstrate a measurable quantum of support or a level of political viability. *Lee v. Keith*, 463 F.3d 763, 769 (7th Cir. 2006). The "preliminary demonstration of a 'significant modicum of support' furthers the state's legitimate interest of 'avoiding confusion, deception, and even frustration of the democratic process at the general election.'" *Rednour*, 108 F.3d at 774 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)). The Supreme Court in *Munro* held that a state is not required to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of such reasonable restrictions on ballot access. *Munro*, 479 U.S. at 194-95. "To demand otherwise would require a state's political system to sustain some damage before it could correct the problem, deprive state legislatures of the ability to show foresight in avoiding potential deficiencies, and inevitably lead to endless litigation regarding the sufficient amount of voter confusion and ballot overcrowding needed to warrant ballot access restrictions." *Rednour*, 108 F.3d at 774 (citing *Munro*, 479 U.S. at 195-96).

Applying the balancing test articulated in *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983), a court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against

"the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789). A regulation that severely burdens First Amendment rights must be justified by a compelling interest and must be narrowly tailored to serve that interest. *Anderson*, 460 U.S. at 789. On the other hand, a state law that imposes only "reasonable, nondiscriminatory restrictions" upon the protected rights passes constitutional muster if it serves important state regulatory interests. *Burdick*, 504 U.S. at 434.

The Supreme Court repeatedly has recognized that states have a legitimate interest in regulating the number of candidates appearing on the ballot as a means "to forestall frivolous candidacies and concomitant 'laundry list' ballots that merely serve to confuse the voter[.]" *Lubin v. Panish*, 415 U.S. 709, 718 (1974). Long lists of marginal candidates discourage voter participation and confuse and frustrate those who wish to seriously participate in the electoral process. *Id.*; see also *Storer v. Brown*, 415 U.S. at 732-33 ("the State understandably and properly seeks to prevent the clogging of its election machinery, avoid voter confusion, and assure that the winner is the choice of a majority, or at least a strong plurality, of those voting, without the expense and burden of runoff elections"). As the Seventh Circuit noted in *Protect Marriage Illinois v. Orr*, 463 F.3d 604, 607 (7th Cir. 2006), if a state was required to list everyone who wanted to stand for office, "ballots would be the size of telephone books." In addition to limiting the number of candidates so that states and other governmental bodies can run fair, effective, and organized elections, states have a legitimate interest in "avoiding confusion, deception, and even frustration of the democratic process at the general election." *Rednour*, 108 F.3d at 774 (quoting *Jenness*, 403 U.S. at 442); see also *Lee v. Keith*, 463 F.3d at

769.  As the Supreme Court held in *Lubin v. Panish*, "[t]he means of testing the seriousness of a given candidacy may be open to debate; the fundamental importance of ballots of reasonable size limited to serious candidates with some prospects of public support is not." 415 U.S. at 715.

A state can "impose reasonable restrictions on access, as by requiring * * * that the would-be candidate demonstrate significant support for his candidacy by submitting thousands (or, depending on the size of the electorate, tens or even hundreds of thousands) of petitions in order to prevent the voter confusions that would be engendered by too long a ballot." *Protect Marriage Illinois*, 463 F.3d at 607-08.  To reach the requisite 12,500 signatures, a potential candidate need obtain signatures from fewer than 1% of the registered voters in Chicago. While acquiring the requisite signatures undoubtedly requires effort and some resources, not every candidate expressing a desire to become a candidate for these offices is entitled as a matter of right to a place on the ballot.  As the Supreme Court said in *Lubin*, "[a] procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process."  415 U.S. at 715.

In rejecting Plaintiffs' identical challenge to the 12,500 signature requirement in their motion for preliminary injunction, the Court cited numerous federal court decisions upholding similar provisions in other states' laws against constitutional attack (see 1/10/11 Mem. Op. at 11, fn. 6).  Those decisions make it "abundantly clear from the long line of cases *** that Illinois' requirement that candidates for the offices of mayor, clerk and treasurer in the City of Chicago submit petitions containing signatures of 12,500 voters, which is less than 3% of the

voters who voted in the last city election and less than 1% of the number of registered voters in Chicago, passes constitutional muster under existing, controlling precedent." *Id.* at 13. Plaintiffs nevertheless once again argue that the 12,500 signature requirement "is onerous and restrictive" and is "so high that it effectively bars the development of candidacies of unknown persons." (TAC, ¶¶ 13, 24, 41). The Court previously rejected that contention, noting that the "history and the facts" arising out of the February 2011 municipal election did not support Plaintiffs. 1/10/11 Mem. Op. at 8. Specifically, this Court observed that in the 2007 Municipal General Election, in which the 12,500 signature requirement first applied, seven candidates appeared on the municipal ballot: three for mayor; three for city clerk; one for treasurer. *Id.* There were 15 individuals who obtained at least 12,500 signatures for the 2011 election for the position of mayor alone, nine of whom survived petition challenges. *Id.* The Court observed that "[t]he number of candidates meeting the signature requirement 'illustrates that the requirements do not pose an insurmountable obstacle' to the municipal ballot," *Id.* (quoting *Rednour*, 108 F.3d at 775).

Both the Seventh Circuit and the U.S. Supreme Court have addressed similar and more restrictive signature requirements and held them to be constitutionally sound. Based on those decisions, this Court reasoned that the "12,500 signature requirement is not an unreasonable means of measuring the seriousness of the candidate's desire and motivation to gain ballot access in a city containing over 1.3 million registered voters." 1/10/11 Mem. Op. at 8; see also *Lubin v. Panish*, 415 U.S. 709, 718 (1974) ("[a] procedure inviting or permitting every citizen to present himself to the voters on the ballot without some means of measuring the seriousness of the candidate's desire and motivation would make rational voter choices more difficult because of the size of the ballot and hence would tend to impede the electoral process"). The

Court ruled that Plaintiffs "had no likelihood of success in proving the unconstitutionality of the current 12,500 signature *** absent a change in controlling law." *Id.* There has been no change in the controlling law since that determination by this Court. In the face of the overwhelming Supreme Court and Seventh Circuit case law to the contrary, Plaintiffs cannot establish that 65 ILCS 20/21-28(b) is unconstitutional.

### B. 90-Day Collection Period

Plaintiffs' third amended complaint does not identify or reference the source of the "90 day collection period" of which they complain. There is, however, a provision in § 10-4 of the Election Code (10 ILCS 5/10-4), which provides, "No petition sheet shall be circulated more than 90 days preceding the last day provided in Section 10-6 for the filing of such petition." This provision was added to Section 10-4 in 1984 by Public Act 83-1055. Thus, the "90 day collection period" was in effect in four (*Norman v. Reed,* 502 U.S. 279 (1992); *Lee v. Keith,* 463 F.3d 763*; Rednour,* 108 F.3d 768*;* and *Black v. Cook County Officers Electoral Board,* 750 F. Supp. 901 (N.D. Ill. 1990)) of the six cases in which the courts, post-1984, addressed the constitutionality of signature requirements more onerous than the 12,500 signature requirement at issue here. In three of those cases, the courts held that such signature requirements were constitutional, despite the fact those signatures were subject to the 90-day collection period. In the other case, *Lee v. Keith*, the Seventh Circuit decided that Illinois' signature collection procedures, operating in tandem with other ballot access restrictions for independent candidates – characterized by the court as being of "unrivaled severity" – could not withstand constitutional scrutiny. 463 F.3d at 769.

In *Lee*, the Seventh Circuit appeared most concerned with two changes made to Illinois law in 1975 and 1979. First, the deadline for independent candidates to file nominating

petitions was pushed back from 92 days before the November general election to 92 days before the March primary, or 323 days before the November general election. 463 F.3d at 764. The *Lee* court observed this was "by far the earliest filing deadline in the nation" for independent candidates. *Id.* at 768. Second, the signature requirement for independent candidates was doubled, from 5% of the vote in the last general election for the office sought, to 10%. *Id.* at 764. The court noted that among the 28 states in the nation that required independent candidates to collect signatures from registered voters equal to a specified percentage of the vote cast in the previous general election, Illinois' 10% signature requirement stood alone: "it is the only one that exceeds 5%." *Id.* at 766. The *Lee* court noted the "dramatic impact" that these two changes had on ballot access: "Before 1975, independent candidates for the state legislature qualified for the ballot occasionally, though not frequently. Since 1980, however – the year following the second of these changes – not a single independent candidate for state legislative office was qualified for ballot access." *Id.* at 765. The Lee court ultimately held the early filing deadline, the 10% signature requirement, and the restriction disqualifying an independent candidate's petition signers from voting in the primary, combined to severely burden a candidate's rights. *Id.* at 772.

This case is not *Lee*. First, this case does not involve the early filing deadline for certain candidates that *Lee* found to be problematic. Second, the percentage required for ballot access in *Lee* was substantially higher than the percentage resulting from the 12,500 signature requirement.[4] Third, the *Lee* court pointed to the fact that not a single candidate had been able to successfully overcome the hurdles imposed by the combined ballot access restrictions as

---

[4] This signature requirement – which is equal to 2.7% of the voters who voted in the last election, or less than 1% of registered voters in Chicago (1/10/11 Mem. Op. at 7, 12) – is far less than the 5% threshold that the Supreme Court and many courts have found to be constitutionally adequate and significantly lower than the 10% threshold at issue in *Lee*.

compelling evidence they were impermissibly burdensome. As this Court previously observed, nine candidates met the requirements for the position of mayor in the February 2011 General Municipal Election, undermining the argument that the restrictions presented an "insurmountable obstacle" to the municipal ballot.

Looking at cases beyond *Lee*, in *American Party of Texas v. White*, the Supreme Court held that a 55-day period for circulating petitions in the State of Texas was not "an unduly short time" for collecting 22,000 signatures. 415 U.S. 767, 787 (1974). The Court estimated 22,000 signatures could have been collected at a rate of 400 per day. "Constitutional adjudication and common sense are not at war with each other, and we are thus unimpressed with arguments that burdens like those imposed by Texas are too onerous, especially where two of the original party plaintiffs themselves satisfied these requirements." *Id*. Particularly pertinent here, the Court determined that 55 days was enough to collect 22,000 signatures notwithstanding the fact Texas had a law providing that a voter may not sign more than one petition for the same office and was barred from signing any petitions if he voted at either primary election of any party at which a nomination was made for that office, thus limiting the available pool of petition signers. *Id.* at 788.

In *Nader v. Keith*, 2004 WL 1880011, *6 (N.D. Ill. 2004), aff'd, 385 F.3d 729 (7th Cir. 2004), the court examined *American Party of Texas* and commented, "In short, the Supreme Court has upheld against constitutional challenge a scheme virtually indistinguishable from the Illinois scheme that is at issue in this case. It is true that Illinois' deadline is twelve days earlier than the one at issue in American Party of Texas—132 days before the election as opposed to 120. But Illinois, unlike the Texas statute examined in that case, does not limit petition circulation to a fifty-five day period." The court also observed, "Illinois provided a

considerably longer period of time to qualify for the ballot than the statutory scheme approved in American Party of Texas *** Nader had at least three good months *** to obtain the necessary signatures—a full month longer than the period approved in American Party of Texas." *Id.* Using a calculation similar to that made by the Supreme Court in *American Party of Texas*, the court estimated that the candidate "had to collect about 280 valid signatures per day for ninety days to qualify; if he had only 100 canvassers for the entire state of Illinois, this would require each canvasser to obtain only three valid signatures per day." *Id.* The court concluded that the requirements were not unduly onerous and did not impose a "severe" restriction on ballot access of the type necessary to trigger heightened scrutiny.

On appeal, the Seventh Circuit assumed that 40,000 petition signatures would need to be collected (to supply a comfortable margin in the event of challenges) and estimated that 100 canvassers could have collected that number averaging 4 or 5 signatures a day. *Nader*, 385 F.3d at 736. The Seventh Circuit concluded, "If Nader could not recruit 100 canvassers in Illinois, his electoral prospects were dismal indeed." *Id.* Here, the Plaintiffs-candidates needed to collect 12,500 signatures in 90 days, which is equivalent to 139 signatures per day. Adopting the same method of calculation as used in *American Party of Texas* and *Nader*, four signatures per day could have been collected by 35 circulators (or "canvassers" as the courts have referred to them) over the 90 days to meet the minimum signature requirement for mayor, clerk, or treasurer of the City of Chicago.

Given the Supreme Court's holding in *American Party of Texas* and subsequent authority, Plaintiffs' challenge to the 90-day circulation period cannot succeed. Plaintiffs' third amended complaint does not plausibly assert facts demonstrating that the 90-day circulation period, either separately or in combination with the 12,500 signature requirement, "severely"

burdens candidates' access to the ballot. Any such burden is not unduly onerous, and moreover, is justified by Illinois' interest in regulating access to the ballot.

### C. One-Signature Rule

Plaintiffs contend that the "Election Code does not bar Chicago voters from signing more than one petition as in signing for more than one candidate." TAC at ¶30. They aver that the Board (as opposed to the Code) has implemented such a policy. Notwithstanding this oft-repeated allegation, Plaintiffs later take the irreconcilable position that the Board enforces a state statute, 10 ILCS 5/10-3, which limits voters to the signing of one petition. TAC at ¶34. Defendant maintains that irrespective of which way Plaintiffs have pleaded, their challenge to the constitutionality of a requirement that limits voters to signing only one candidate's petition for the offices of mayor, clerk and treasurer in the City of Chicago fails.

65 ILCS 20/21-28 governs the nomination by petition of candidates for the offices of mayor, city clerk, city treasurer, and alderman in the City of Chicago. The challenged 12,500 minimum signature requirement is found in § 20/21-28(b). Plaintiffs' assertion that the one signature rule found in the Election Code does not apply to nominating petitions governed by § 20/21-28 fails to account for subsection (c) of that statute, which provides that all petitions thereunder "shall conform in other respects to the provisions of the election and ballot laws then in force in the City of Chicago concerning the nomination of independent candidates for public office by petition." 65 ILCS 20/21-28(c). Section 20/21-28(c) by its express terms looks to other statutes for additional requirements, and it specifically looks to and incorporates the statutes applicable to the nomination of independent candidates.

Section 10-3 of the Election Code applies to nomination of independent candidates. 10 ILCS 5/10-3. According to Section 10-3, each voter signing a nomination petition "may subscribe to one nomination for such office to be filled, and no more." *Id.* Consistent with the Board's 2011 Election Information Pamphlet & Calendar, to which Plaintiffs cite in their third amended complaint, § 20/21-28(c) expressly makes applicable the limitation in § 10-3 of the Election Code (that a person may not sign more than one nominating petition for each office) to nominating petitions governed by § 20/21-28. In addition, § 10-3.1 of the Election Code (10 ILCS 5/10-3.1) states, "[T]he provisions of this Article 10 relating to *independent* candidate petition requirements *shall apply to nonpartisan petitions* to the extent they are not inconsistent with the requirements of such other statutes or ordinances" (emphasis added). Elections for mayor, city clerk and city treasurer in the City of Chicago are nonpartisan – no political party affiliation is permitted. 65 ILCS 20/21-5, 20/21-12, 20/21-32. The provisions in Article 10 regarding the nomination of independent candidates are not inconsistent with the requirements for the nomination papers for mayor, city clerk and city treasurer, and therefore apply to those petitions. And as noted above, 65 ILCS 20/21-28(c) incorporates provisions of Article 10 where 65 ILCS 20/21-28 does not otherwise specify. Putting all of this together, the "one signature" rule of Section 10-3 applies to candidates' petitions for the offices of mayor, city clerk and city treasurer in the City of Chicago elections.[5] The requirement that voters may subscribe to only one petition for mayor, clerk and treasurer is, therefore, not a mere "notion" or "policy" (see TAC at ¶30, fn. 4), but rather is Illinois law.

Thus, Plaintiffs must demonstrate that the application of § 10-3 of the Election Code to nominating petitions for Chicago's municipal offices contributed to a constitutionally

---

[5]  The provision limiting each voter to signing "one nomination for each office to be filled and no more" has been a part of Illinois law since at least 1891.

impermissible ballot access burden. As previously noted, far more onerous minimum signature requirements, many with the same "one signature" limitation imposed by Section 5/10-3 or similar statutes (see, *e.g., Storer v. Brown*; *American Party of Texas v. White*; *Jackson v. Ogilvie*), have passed constitutional muster. Furthermore, actual evidence of significant candidate access to the 2011 municipal ballot, discussed at length in the Court's denial of Plaintiffs' motion for preliminary injunction, negates Plaintiffs' contention.

Independent analysis of the "one signature rule" yields the same conclusion. As the Court previously recognized, one of the important state interests in ensuring an orderly electoral process through signature requirements is to limit ballot access to serious candidates who can demonstrate a significant modicum of support. See *Rednour*, 108 F.3d at 774. This interest would be undermined if voters could sign multiple nomination petitions for an unlimited number of candidates for the same office. To ensure that petitions truly reflect a "significant modicum of support" for these municipal offices among the eligible voters of the City electorate, the legislature imposes certain requirements on candidates' petitions. For example, the signatures must come from legal voters who are residents of Chicago. Additionally, and relevant here, each voter is limited to providing only one signature on a petition for each office. Such safeguards ensure that the candidates for office will meet the legislatively determined "modicum of support" (12,500 voters) from the eligible electorate. A minimum signature requirement would not serve this interest if anyone from anywhere could sign a petition. The minimum signature requirement similarly would not have the desired effect if potential voters could sign an unlimited number of petitions.

By way of illustration, suppose Candidate A and Candidate B each obtain 12,500 petition signatures. Assume there are 3,000 people who signed petitions for both candidates,

ostensibly because there is no "one signature rule." Assume further those 3,000 voters will split their votes equally for Candidates A and B. In this hypothetical, each candidate's true support is really only 11,000 voters. In other words, the actual community support for Candidates A and B is less than the minimum level of support (12,500 voters) deemed necessary by the legislature to earn a spot on the ballot. Put another way, the "one signature" rule makes the minimum signature requirement a meaningful restriction.

In a footnote, Plaintiffs advance the proposition that "[v]oters have a First Amendment right to champion for more than one candidate to 'get on' the ballot." TAC at p. 9, fn. 2. The Supreme Court's reasoning in *American Party of Texas* suggests otherwise. There, the Supreme Court upheld a Texas statute prohibiting anyone who voted in a party primary from signing the petition of any candidate of another party. Acknowledging that the pool of possible supporters was reduced, the Court characterized this restriction as "nothing more than a prohibition against any elector's casting more than one vote in the process of nominating candidates for a particular office." 415 U.S. at 785. As the Court explained, "Electors may vote in only one party primary; and it is not apparent to us why the new or smaller party seeking voter support should be entitled to get signatures of those who have already voted in another nominating primary and have already demonstrated their preference for other candidates for the same office the petitioning party seeks to fill." *Id.* The Court summarized, "[t]hus, the state's scheme attempts to ensure that each qualified elector may in fact exercise the political franchise. He may exercise it either by vote or by signing a nominating petition. He cannot have it both ways." *Id.* (quoting *Jackson v. Ogilvie*, 325 F. Supp. at 867). The Court saw nothing invidious in disqualifying those who have voted at a party primary from signing petitions for another party seeking ballot position for its candidates for the same

offices. See also *Storer v. Brown*, 415 U.S. at 741 (confirming the reasoning of *American Party of Texas*: "we have no doubt about the validity of disqualifying from signing an independent candidate's petition all those registered voters who voted a partisan ballot in the primary, although they did not vote for the office sought by the independent").

In this case, the language of the statute in question makes apparent the legislature's intention to limit a voter to one nomination for each office. Voters cannot sign petitions for more than one party (10 ILCS 5/7-10), nor may they vote in more than one primary election (10 ILCS 5/7-44); each voter, by his primary vote, is limited to nominating one candidate for each office for the general election ballot. Likewise, once a voter has signed one independent candidate's petition, he may not sign another candidate's petition. This is consistent with the principle of "one person, one vote."

Plaintiffs have not presented plausible facts demonstrating that the limitation of signing one candidate petition per office, either separately or in combination with the 12,500 signature requirement, "severely" burdens candidates' access to the ballot. Again, ample case law demonstrates the futility of the claims asserted in the third amended complaint. The burden imposed by the legislature—and there is indeed a burden on potential candidates for mayor, clerk, and treasurer of the City of Chicago—is, according to a wealth of precedent, justified by Illinois' legitimate interests in requiring that candidates demonstrate a sufficient modicum of support of voters in the community before access to the ballot is warranted. As the Court pointed out in denying Plaintiffs' motion for preliminary injunction, in view of cases upholding a 5% signature requirement, the fact that it may be more difficult to qualify for a spot on the mayoral ballot in Chicago than in many other large cities raises an issue of public policy for the General Assembly, not a matter for redress under the Constitution.

### D.    Alleged Misrepresentation To The Court

Instead of offering legal authority in support of their position, Plaintiffs in their response brief spend the majority of the brief accusing Defendant of intentionally and willfully misleading Plaintiffs, the Court, and the Seventh Circuit about the one-signature rule.  The record does not support such a conclusion.

At the preliminary injunction hearing on Plaintiffs' original claim, the Court asked if there was a limitation that a person could sign only one petition in a non-partisan race, and counsel for the Board stated, "I'm not aware there is such." (1/4/11 Transcript, Dkt. #59-1, at p. 30). As subsequently clarified by the Board, there was a rule applicable to the 2011 mayoral election. Contrary to Plaintiffs' repeated accusations, the Court's view is that the Board's counsel did not "misrepresent" anything; rather, he represented that he was unaware of the rule.  Under the time constraints of addressing the constitutionality of the 12,500 signature requirement—the Court received this case on December 17, 2010, set a briefing schedule on Plaintiffs' motion for injunctive relief, held a hearing on January 4, 2011, allowed Plaintiffs to amend their complaint on January 6, 2011, and then issued a decision denying the request for injunctive relief on January 10, 2011—the Board's counsel evidently did not focus on the tangential and undeveloped issue of whether a "one signature rule" applied, particularly since Plaintiffs themselves suggested that there was no such rule.[6]  The Board's counsel was, at

---

[6]   The pleadings history and record reflect the contradictory positions taken by Plaintiffs as to whether there is such a rule.  In Plaintiffs' second amended complaint, filed 1/6/11 (prior to the Court's ruling on Plaintiffs' motion for preliminary injunction), Plaintiffs asserted:  "The Election Code does not bar Chicago voters from signing more than one position as in signing for more than one candidate."  Then, in the summer of 2011, Plaintiffs argued in a motion to reconsider that "[t]he booklet/pamphlet  * * * bolsters the very argument [plaintiffs] made in their District Court Brief * * * that there is a one signature ballot access restriction imposed by the Chicago Board of Elections." See Plaintiffs' Motion to Reconsider, Dkt. #64, pp. 7-8.  Then, in direct contradiction to that representation, on July 26, 2011, Plaintiffs' counsel told this Court, "Your Honor, there isn't any legislation in my professional opinion that says to the Board of Elections 'You must impose a one signature rule.'"  Finally, in the proposed

worst, simply mistaken and did not "intentionally" or "willfully" mislead the Court. Moreover, as discussed above, the law confirming that there is indeed a "one signature rule" was (and is) equally accessible to both side in this litigation.

## III. Conclusion

For the reasons stated above, the Court grants Defendant's motion to dismiss Plaintiffs' third amended complaint [102]. By attempting to assert claims based on arguments and theories soundly rejected by extensive Supreme Court and Seventh Circuit precedent, Plaintiffs fail to demonstrate a viable legal basis for any of those claims. This being Plaintiffs' fourth bite at the apple, no further amendments are warranted and this case is dismissed with prejudice.

Dated: July 8, 2013

_____
Robert M. Dow, Jr.
United States District Judge

---

third amended complaint, filed 10/25/11, Plaintiffs presented an inherently inconsistent position: Plaintiffs initially allege there is a statutorily imposed one-signature rule enforced by the Board (Dkt. #71, pp. 5-6, ¶¶ 12-13), then, in the same pleading, contend that "the Election Code does not bar Chicago voters from signing more than one petition as in signing for more than one candidate." (*Id.,* p. 9, ¶22).